STATE OF MISSOURI, APPELLANT v. ARTHUR MAHER, RESPONDENT.—
124 S. W. (2d) 679.

In the Springfield Court of Appeals.   February 6, 1939.

*Roy McKittrick,* Attorney-General, *Wm. Orr Sawyers* and *Arthur O'Keefe,* Assistant Attorneys-General, for appellant.

*Emerson Foulke* and *A. E. Spencer, Sr.,* for respondent.

FULBRIGHT, J.—On March 30, 1937, a grand jury presented in open court of Jasper County, division No. 1, an indictment charging the defendant with official misconduct and negligence in office. On motion of defendant a change of venue was granted to division No. 2 of said circuit court. From a judgment sustaining a motion to quash the indictment the State appealed to the Supreme Court where, upon motion of defendant, the cause was transferred to this court.

The indictment, omitting the formal parts, is as follows:

"The Grand Jurors of the State of Missouri, within and for the body of the County of Jasper, now here in Court, duly impaneled, sworn and charged, upon their oath present, That in the County of Jasper, aforesaid, and on the first day of February in the year of one thousand nine hundred and thirty-seven (and for a long time prior thereto), one Arthur Maher was a public officer and a person holding trust and appointment, within and for the county of Jasper and State of Missouri, to-wit: The Mayor of the city of Joplin, in charge and control of the department of Public Safety, duly elected, appointed, enrolled and employed as provided by law, assigned and detailed to, and the principal officer of public safety, and in command of that portion of territory in Jasper County, Missouri, known and designated as the city of Joplin, for the purpose of public safety in city government; that the said Arthur Maher was then and there, (and for a long time had been) by virtue of the laws of the State of Missouri, a public officer.

"That he, the said Arthur Maher was then and there, (and for a long time prior thereto had been) duly elected, appointed and designated as such chief mayor for the city of Joplin, Missouri, under and by virtue of the laws of the State of Missouri, and was then and there (and for a long time prior thereto had been) duly commissioned, sworn and assigned as chief officer of public safety, and in command, control, supervision and direction, for the purpose of public safety in city government and to enable subordinate police officers to perform the duties imposed upon them by law, of the said city of Joplin, Missouri.

"That under and by virtue of the laws of the State of Missouri, it was the official duty of the said mayor of Joplin, Missouri, and every member of said police force of said city, appointed, enrolled

and employed, as aforesaid, and the official duty of him, the said Arthur Maher, as·such chief officer of the department of public safety, and as such public safety officer, and as such municipal corporation officer, at all times of the day and night, within the boundaries of said city, to preserve the public safety, to prevent crime and cause to be arrested offenders of the criminal law, to prevent and remove dangerous nuisances on all streets and highways and other places, and to see that all laws of the State of Missouri, relating to gambling devices, gaming houses, bawdy houses, brothels, vagrant and disorderly persons, were enforced.

"That he, the said Arthur Maher, as such chief safety officer, then and there, (and for a long time prior thereto), had under his command and subject to his orders, numerous subordinate police officers, members of said police department, and was vested with adequate power and authority as such mayor in command of the department of public safety in Joplin, Missouri, and as such public and State officer, for the proper and efficient performance of the duty aforesaid.

"That in the said County of Jasper, and on the first day of February, in the year one thousand nine hundred thirty-seven (and for a long time prior thereto), and within the municipal corporation's territorial limits of Joplin, Missouri the said Arthur Maher, as Mayor, aforesaid, there were and had been, for a long time continuously, publicly, flagrantly, openly and notoriously set up, kept and maintained certain common gaming houses and gambling devices, and that then and there (and for a long time prior thereto), unlawful and disorderly conduct and practices were committed in each and all of said common gaming houses, and gambling devices were set up and kept in said houses, and divers common gamblers, vagrants and disorderly persons resorted to said gaming houses for the purpose of certain prohibited and illicit gambling, consisting of bookmaking and pool selling commonly so-called, whereby wagers on horse racing were registered, and divers common gamblers, vagrants, and disarderly persons resorted to said houses for the purpose of playing on gambling devices therein set up and kept, to-wit: Slot machines, commonly recognized as mechanical devices, into which money and chips were played, and crap tables, commonly so-called, upon which dice, money and chips were thrown and used, and poker and blackjack tables upon which cards, money and chips were used, all of which gambling devices were adapted, devised and designed for the purpose of playing games of chance for money; which said gaming houses and gambling devices enticed and permitted divers persons to bet and play in said gaming houses, and at and upon and by means of said gambling tables and gambling devices; which said common gaming houses and gambling devices were so set up and

kept and maintained in the said city of Joplin, Missouri, in certain buildings situated upon certain streets and highways of said city, known and designated as Main Street near the intersection of Seventh Street, the exact numerous street locations being to this Grand Jury unknown.

"That at the County of Jasper, and on said first day of February, in the year one thousand nine hundred thirty-seven (and for a long time prior thereto), and within the municipal corporation's territorial limits of Joplin, Missouri, the said Arthur Maher, as Mayor, as aforesaid, there were and had been for a long time, continuously, publicly, flagrantly, openly and notoriously set up, kept and maintained certain common bawdy houses and brothels, and that then and there (and for a long time prior thereto), unlawful disorderly conduct and practices were committed in each and all of said houses and divers common prostitutes and bawds, vagrants and disorderly persons resorted to and resides in said houses for the purposes of common prostitution and bawdry, and solicited men for the purpose of sexual intercourse therefrom and in front thereof; which said common bawdy houses and brothels were so set up, kept and maintained, in the said city of Joplin, in certain buildings situated upon certain streets and highways of said city, known and designated as Pennsylvania Avenue, near the intersection of Third Street, the exact numerous street locations being unknown to this Grand Jury.

"That it was the official duty, as aforesaid, of the said Arthur Maher, as Mayor, as aforesaid, in command of the department of public safety in the city of Joplin, Missouri, as aforesaid, as such safety officer and public officer, as aforesaid, to cause to be arrested all persons known to him who in his presence were seen violating the criminal laws of the State of Missouri (the true names of said persons being unknown to this Grand Jury), for violation of the law and for crime in so setting up, keeping and maintaining said gambling devices, common gaming houses, common bawdy houses and brothels, as aforesaid, in said city of Joplin, Missouri, that they might be dealt with according to law, and to prevent said violation of law and crime. and to prevent and remove such gambling devices, common gaming houses, common bawdy houses and brothels, as common nuisances, and to arrest and cause to be arrested said gamblers, common prostitutes, bawds and disorderly persons, as vagrants.

"That nevertheless, the said Arthur Maher, being such Mayor, as aforesaid, and commanding the department of public safety in the city of Joplin, Missouri, as aforesaid, and being such safety officer and public officer, as aforesaid, and then and there (and for a long time prior thereto), well knowing the premises, as aforesaid, did then and there, in his official capacity and under color of his said

office, unlawfully, knowingly, willfully and corruptly, wholly neglect and did arbitrarily omit and refuse to perform his said official duty enjoined on him by law, as aforesaid, and then and there continuously did knowingly, unlawfully, willfully and corruptly wholly neglect and omit and refuse to use and exercise and to cause to be used and exercised, all proper, reasonable effective means within his power and authority, as such Mayor and as such public officer and State officer, for the prevention of the setting up, keeping and maintaining of the said gambling devices, common gaming houses, common bawdy houses and brothels and each of them, for the detention and arrest of the persons so setting up, keeping and maintaining the same.

''But on the contrary, he, the said Arthur Maher, Mayor, as aforesaid, and safety officer and public officer, as aforesaid, did then and there arbitrarily stand by and willfully, corruptly and knowingly suffer and permit the said gambling devices, common gaming houses, common bawdy houses and brothels to be openly, publicly, flagrantly and notoriously set up, kept and maintained at and in the buildings aforesaid, and the said unlawful and disorderly conduct and practice to be openly, publicly, flagrantly and notoriously committed, therein, as aforesaid, without any interference on the part of him, the said Arthur Maher, Mayor, as aforesaid, and safety officer and public officer, as aforesaid, and without any proper, reasonable and effective endeavor on his part toward the suppression thereof, or toward the detection and arrest of the persons setting up, keeping and maintaining the same, and without any proper, reasonable or effective endeavor on his part for the enforcement of the law of this State respecting gambling, gambling devices, common gaming houses, common bawdy houses and brothels, and for the prevention of the violation of the laws of this State in respect to the setting up and keeping of gambling devices and common gaming houses, common bawdy houses and brothels, and in respect to vagrants and disorderly persons, inmates, keepers and employees thereof, and he, the said Arthur Maher, Mayor, as aforesaid, did then and there arbitrarily stand by and knowingly, willfully, corruptly and unlawfully, did refuse to maintain the dignity and majesty of the criminal law of the State of Missouri, by arbitrarily refusing to take any legal steps necessary to the faithful performance of his oath of office to support the Constitution and the laws of the State of Missouri, and inform in court against and prosecute those certain persons unknown to this Grand Jury, but known to him, to be setting up and keeping slot machines, dice tables, poker tables, blackjack tables and other gambling devices where the keepers of said devices have permitted or induced persons to play thereon, in Jasper County, Missouri, and he, the said Arthur Maher, Mayor, as aforesaid, and public officer and State officer, as aforesaid, did then and there arbitrarily stand by and

knowingly, willfully, corruptly and unlawfully did refuse to maintain the dignity and majesty of the criminal laws of the State of Missouri, by arbitrarily refusing to take any legal steps necessary to the faithful performance of his oath of office, to support the Constitution and the laws of the State of Missouri, and inform against and prosecute those certain persons unknown to this Grand Jury, but known to him to be setting up and keeping gaming houses, bawdy houses and brothels, and persons known to this defendant to be vagrants and disorderly persons, inmates and keepers and employees in said houses, contrary to the form of statutes in such cases made and provided and against the peace and dignity of the State.''

The only proposition before this court is whether or not the indictment properly charges the defendant with an offense under the law, thus ruling on the correctness of the trial court's action in sustaining the demurrer interposed to the indictment.

Section 22 of Article 2 of our State Constitution provides that in all criminal cases the accused shall have the right ''to demand the nature and cause of the accusation.'' The indictment should state facts which constitute the offense with reasonable certainty so that the defendant may know what he is to answer. He should not have to guess at what he is to defend against or speculate as to the meaning of the allegations in the charge, and this is true in prosecutions for misdemeanors as well as for felonies. The averments should be so clear and distinct and set forth with such precision and fullness that there could be no difficulty in determining what evidence would be admissible under them, and so that the court and jury may know what they are to try, of what they are to acquit or convict the defendant, and so that the record may show, as far as may be, of what the defendant has been put in jeopardy. [State v. Krueger, 134 Mo. 262, 35 S. W. 604, State v. Griffith, 311 Mo. 630, 279 S. W. 135; State v. James, 37 Mo. App. 214; State v. McGrath, 228 Mo. 413, 128 S. W. 966.]

The indictment is bottomed on Section 3950, Revised Statutes of Missouri 1929, which reads, in part, as follows: ''Every officer or person holding any trust or appointment, who shall be convicted of any willful misconduct or misdemeanor in office, or neglect to perform any duty enjoined on him by law, where no special provision is made for the punishment of such misdemeanor, misconduct or negligence, shall be punished . . .''

As a general rule it is sufficient to frame the indictment in the words of the statute. [State v. Newman, 152 Mo. App. 144, 132 S. W. 753; State v. Ferris, 322 Mo. 1, 16 S. W. (2d) 96; State v. Settle, 46 S. W. (2d) 882.] This is true only where the statute describes the entire offense by setting out the facts constituting it. But we do not think the rule can be applied to the statute above

quoted. The rule does not apply if the statute creating the offense uses generic terms in defining the offense and does not individuate the offense with such particularity as to notify the defendant as to what he shall defend against. Under these conditions the indictment in the language of the statute is not sufficient. As stated by Judge SHERWOOD, in the case of State v. Terry, 109 Mo. 601, 19 S. W. 206, "Following the general language of the statute will not answer, only in those instances where *all* the *facts* which constitute the offense are *set forth* in the *statute itself*, which declares or announces or creates the offense."

The gist of this charge is that certain persons had set up and were publicly and notoriously operating gambling houses and bawdy houses and that defendant knew these facts and took no action. In drawing the indictment the State charges these gambling houses were "*situated upon certain streets and highways* of said city, known and designated as Main Street near the intersection of Seventh Street, *the exact numerous street locations being to this Grand Jury unknown;*" that "the common bawdy houses and brothels were so set up, kept and maintained, in the said city of Joplin, *in certain buildings situated upon certain streets and highways* of said city known and designated as Pennsylvania Avenue, near the intersection of Third Street, *the exact numerous street locations being unknown* to this Grand Jury;" and that Arthur Maher "knowingly, willfully, corruptly and unlawfully did refuse to maintain the dignity and majesty of the criminal laws of the State of Missouri, by arbitrarily refusing to take any legal steps necessary to the faithful performance of his oath of office, to support the Constitution and the laws of the State of Missouri, and inform against and prosecute *those certain persons unknown to this Grand Jury, but known to him* to be setting up and keeping gaming houses, bawdy houses and brothels."

It is not sufficient, we think, to allege in a general way that an indefinite number of gambling houses, bawdy houses and brothels were kept and maintained with the knowledge of the defendant, without describing with reasonable accuracy any one of them. It can be easily seen that the indictment does not fix the location of a single house, and does not name the operator, owner, or any individual connected therewith, but states that the exact street location of the houses and the persons managing them are unknown. It must be borne in mind that the indictment before us attempts to charge nonfeasance in office and is not a direct charge against defendant for operating gambling houses, bawdy houses, and brothels. These averments, especially as to the location of the buildings, are germane to the indictment in the instant case and cannot be treated as collateral matters as contended by the State. It is permissible that certain facts when unknown to the Grand Jury may be so alleged, but

this allegation of unknown facts will not excuse the setting out of the substance of the essentials. So if the grand jury cannot state what is necessary for the defendant to know in making his defense, it should not indict him. A motion to quash an indictment should be sustained if it appears on its face that a person or thing alleged to be unknown was known, or could have been known by the exercise of ordinary diligence. As was said by Bishop in his Criminal Procedure, Vol. 2, sec. 550, page 446: "The grand jury is by law required to ascertain the facts before indicting a man; and if they will not, but will insist upon declaring a thing to be unknown while refusing to learn it, a thing which the law made it their duty to ascertain, surely wrong does not take from the defendant his right to object to a defective allegation."

The defendant in the instant case is entitled to be informed of at least one of the places or buildings where an unlawful business was conducted, and if the information is in the possession of the grand jury, he is also entitled to be informed who was engaged in the conduct of such unlawful enterprise. As the indictment is drawn, the defendant, in order to make a defense would have to be prepared with evidence covering every building within an indefinite area only hinted at in the indictment. It is alleged that certain facts were known to the defendant, yet unknown to the grand jury. It is difficult to conceive just how the grand jury could determine that these unlawful enterprises were maintained openly and publicly in numerous buildings, and that the defendant knew their locations and the persons operating and maintaining them, unless the grand jury was in possession of such information. If it had evidence before it to establish the fact that defendant knew the buildings in which these various illegal enterprises were maintained and the numerous operators thereof, it is obvious that the grand jury was possessed of the same knowledge and information it charges to the defendant.

The case of State v. Asher, 216 S. W. 1013, we think, is particularly in point. In that case it was held that the information charging defendant to be a delinquent child in that she knowingly associated with vicious and immoral persons, was held by the court to be insufficient to sustain conviction for failing to name the persons with whom she was accused of associating. [See also State v. Hogan, 31 Mo. 340; State v. Nunley, 185 Mo. 102, 83 S. W. 1074; State v. Murphy, 164 Mo. App. 204, 147 S. W. 520; and State v. Futrell, 329 Mo. 961, 46 S. W. (2d) 588.]

The State cites numerous cases from Missouri and other jurisdictions in support of the indictment and insists that it follows the material allegations in the indictment in the case of State v. Boyd, 196 Mo. 52, 94 S. W. 536, except that in the instant case the pleader

has added thereto the charge that nonfeasance was done willfully and corruptly which allegation was omitted in the Boyd case. In that case the indictment stated specifically the location of the bawdy houses and brothels and the names of the operators of each. Similarly, in the case of People v. Herlihy, 73 N. Y. Sup. 236, from which the Boyd case quotes extensively, the pleader stated definitely the location of the buildings in which unlawful enterprises were conducted and named the operator of each.

It is our conclusion that the indictment is defective in that it does not set forth with sufficient particularity the location of any of the gambling houses and bawdy houses alleged to have been operated and maintained, and that it is so vague, indefinite and uncertain that the defendant could not properly prepare a defense, if any he had. In view of this ruling, it is unnecessary to consider other alleged defects. The judgment of the trial court in sustaining the demurrer to the indictment is accordingly affirmed. *Allen, P. J.,* and *Smith, J.,* concur.